UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

TAHRA KERMAN-MASTOUR,

                    Plaintiff,

          - against -

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC., et al.,

                    Defendants.

10 Civ. 1633 (RJH)

**MEMORANDUM OPINION AND
ORDER**

Richard J. Holwell, District Judge:

          Tahra Kerman-Mastour ("Kerman") brings this diversity suit against her former

employers, the Financial Industry Regulatory Authority, Inc. and FINRA Regulation, Inc.

(collectively "FINRA") pursuant to the New York City Human Rights Law ("NYCHRL"),

N.Y.C. Admin. Code § 8-101 *et seq.*  Plaintiff is not pursuing claims under Title VII of the Civil

Rights  Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*;  or under the New York State

Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*  Kerman was employed as an

attorney by FINRA and a precursor agency in the New York Stock Exchange ("NYSE") for

approximately eight years before she was terminated.  Kerman claims she was terminated as a

result of gender and religious discrimination and in retaliation for her participation in a

committee advocating for changes to FINRA's maternity leave policy; FINRA claims she was

fired because she was incompetent.  FINRA moved for summary judgment on January 25, 2011.

1

The Court heard oral argument on the motion on September 16, 2011.  For the reasons stated

below, FINRA's motion is GRANTED.

## BACKGROUND[1]

Kerman is a lawyer and a devout Orthodox Jew.  (Kerman Aff. ¶ 18.)  She graduated

from Cardozo Law School in 2000 (Kerman Dep. 10: 24-25) and began working at the New

York Stock Exchange ("NYSE") as an attorney approximately one year later (*Id*. 18:10-14,

19:11-12).  Kerman received two promotions without incident, one in December 2002 and a

second in May 2004.  (*Id*. 21:21-22:6.)  During that period, Kerman's written evaluations do not

contain any negative feedback.  (Heller Affirm. Exs. B, C; Light Dep. 32:5-7.)

Kerman's troubles began in 2005.  In Febraury 2005, Kerman's immediate supervisor

was Joy Weber ("Weber"), and her next higher supervisor was Sue Light ("Light").  (Kerman

Dep. 33:14-24.)  In early 2005, Kerman was up for another promotion.  (*Id*. 34:2-3).  On April

15, 2005, a month or two before Kerman could have been promoted, Light called Kerman into

her office and informed her that she was not ready to be promoted at that time.  (*Id*. 34:4-21.)

The parties dispute precisely what form Light's criticism took; however, it is undisputed that

Light told Kerman that she had not demonstrated a proficiency and understanding of more

complex cases, but that Light would recommend her for promotion when she did.  (D. St. ¶ 7;

P. St. ¶ 7.)  Kerman followed up on her conversation with Light by speaking with her most

recent supervisor, Julie Broderick ("Broderick"), and, according to Kerman, Broderick said that

---

[1] FINRA argues that Kerman in her brief relies merely upon factual allegations raised in her self-serving affidavit that merely parrot the allegations of her complaint.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("[A] self-serving affidavit which reiterates the complaint's conclusory allegations is insufficient to preclude summary judgment").  The Court has reviewed Kerman's affidavit and deposition testimony and finds that Kerman describes the same incidents in her affidavit that she also described in her deposition testimony.  In her affidavit, Kerman merely explains how these incidents made her feel.  Whether these allegations are sufficient to withstand summary judgment is a separate question.

Light had not spoken with her and that Broderick had never had problems with Kerman's work. (*Id*. 36:6-21.)  Light recalls speaking to Broderick, but leaving this dispute aside, Light recorded the results of her review of Kerman's work in a memo to Kerman's file prepared in 2005. (Heller Affirm. Ex. D.)  In that memo, Light states that she had spoke with several of Kerman's past supervisors, though she does not name all the supervisors by name.  (*Id*. at 1.)  Light does report that her present supervisor, Joy Weber was disappointed by Kerman's level of performance.  (*Id*.)  Light notes that Kerman's new supervisor, Richard Chin ("Chin"), believed that her present case load was "junior" and that she needed to take on more complex matters. (*Id*.)  Light went through Kerman's cases herself and also found them to be simple cases that a first or second year attorney would handle, not commensurate with her years of experience.  (*Id*.)

Kerman testified that Light's negative review in early 2005 reflected Light's discrimination against her because she had recently announced that she was pregnant with her second child and would be taking maternity leave shortly.  Kerman offers no circumstantial evidence of Light's alleged discriminatory animus.  Light herself is a Jewish mother of two, and Light reported to Susan Merrill ("Merrill"), also a Jewish mother.  (Defs.' 56.1 Stmt. ¶¶ 151-52.) Chin took advantage of the NYSE's paternity leave policy.  (*Id*. ¶ 140.)  In addition, a substantial number of Kerman's coworkers were women, and many of them took maternity leave.  (*Id*. ¶ 154.)  Despite Light's recommendation that Kerman not be promoted, Susan Merrill ("Merrill") decided to give Kerman "the benefit of the doubt" and promote her.  (Merrill Decl. ¶ 3.)

Some months thereafter, Kerman gave birth to her second child and took maternity leave. She returned from maternity leave in February 2006.  (Kerman Dep. 54:19-21.)  After she returned, Richard Chin provided her with an evaluation for her work for the year 2005.  The evaluation stated,

> Tahra should strive to conduct more detailed and comprehensive investigations. Although Tahra completes her investigations quickly, certain of her investigations (described below) omitted information or contained inaccurate information. The omitted information was necessary to conduct an appropriate analysis of the matter.

(Heller Affirm. Ex. E at 1.) The evaluation went on to point out specific deficiencies in Kerman's work product (*id*. at 2) and concluded, "Tahra's overall work performance met the minimum requirements of her position. . . . Although Tahra is receiving a meets requirements rating, it is essential that she further develop her legal and investigative skills" (*id*. at 4).

As with Light's evaluation, Kerman considered Chin's evaluation to be rife with discrimination, largely because Chin had evaluated her negatively despite only having been her supervisor for about three months. (*Id*. at 55: 8-11.)[2]

In early 2007, Chin provided Kerman with an evaluation of her work for the year 2006. This evaluation is considerably improved, stating,

> During the Relevant Period, the quality of Tahra's written work product has improved. The investigative findings section of her documents are very detailed and she does an excellent job finding precedent relevant to the issues in the case. Tahra uses the editing process to develop and hone her skills as a lawyer.

(Heller Affirm. Ex. G at 2.) However, the evaluation does contain a cautionary note that Tahra will be expected to "become more independent in areas that do not require supervisory input" (*id*. at 2) and "investigate and/or prosecute cases involving more complex issues" (*id*. at 5) in 2007. Kerman does not claim that Chin's evaluation was discriminatory. Shortly thereafter, in February 2007, Kerman was promoted to "trial counsel." (Chin Dep. 89:15.)

---

[2] In addition, Kerman stated that the evaluation did not give her credit for certain work that she had completed during the year. (*Id*. 56:4-8.) When Chin learned that the evaluation did not contain a full list of the cases Kerman had worked on, he stated that he would contact human resources to correct the mistake. (*Id*. 66:21-25.)

In March 2007, Kerman announced that she was pregnant with her third child, an announcement that led in Kerman's eyes to a significant deterioration of her relationship with Chin.  (Kerman Aff. ¶ 46.)  Kerman characterized Chin's reaction to her news as "horrific." (Kerman Dep. 79: 16.)  He kept "shaking his head and he couldn't believe it."  (*Id*. 79: 18-19.) He told her, "I'm taking my director's cap off and I'm talking to you like a friend."  (*Id*. 80: 6-8.) He proceeded to ask her, "Was this planned?" "Was this an accident?" "Don't you have your hands full?" and "Isn't two enough?"  (*Id*. 80:13-16.)  Kerman believes that her announcement changed Chin's opinion of her as an attorney, leading him to see her as "a religious mother who was focused more on having children than a career as an enforcement attorney at NYSE." (Kerman Aff. ¶ 51.)

At some point during this approximate time period, Kerman also felt that Chin was being insensitive to her needs as an observant Jew.  He took the unit out for lunch, but picked a restaurant that did not serve Kosher food.  (Kerman Dep. 111:17-23.)  Kerman called ahead to explain to the restaurant that she would be bringing a Kosher meal.  (*Id*. 111:25-112:4.) Nonetheless, she believed that it was culturally insensitive that Chin did not think to make arrangements for her.  (*Id*. 112:22-113:7.)  She did not alert Chin to her unhappiness, either before or after the lunch, however.  (*Id*. 113:8-16.)

In June 2007, Kerman experienced complications with her third pregnancy and had to leave work earlier than expected after her doctor ordered bed rest.  (Kerman Dep. 88:8-12.) While she was out on maternity leave, the division of NYSE that she was working for merged with the National Association of Securities Dealers ("NYSD") to form FINRA.  (Kerman Aff. ¶ 55.)  Kerman was offered a new job with FINRA working for the same supervisor, and she did not have to interview for this position.  (*Id*.)

Kerman returned from maternity leave to her new job at FINRA on February 29, 2008. (*Id.* ¶ 58.)  On March 4, 2008, Kerman received an evaluation for 2007.  The evaluation praised Kerman's work on one trial, but criticized her for the time it took her to complete investigations, for the quality of her written work and the thoroughness of her analysis.  (Heller Affirm. Ex. I.) Kerman claims that in this meeting, Chin stated that he had wanted to say something about her performance earlier, but she was in too many "protective classes."  (Kerman Dep. 137:7.)  Chin denies that he made this remark.  (Chin Dep. 118:11-17.)  Kerman also learned that her 2007 bonus and merit raise were going to be prorated to take into account the fact that she was on maternity leave for a portion of the year.  (Kerman Dep. 138:3-6.)  Kerman had heard from a friend who had also taken maternity leave that her bonus was not prorated.  (*Id.* 138:10-14.) Chin told her he was going to call human resources and find out which practice was appropriate (*id.* 139:3-5), but according to Kerman he also asked her, "Are you telling me that you're deserving . . . of the same bonus of somebody who's been working here a full year?"  (*Id.* 140:7-9.)  Shortly before Chin discussed Kerman's bonus with her, however, he had suggested to HR that her bonus be lowered from $7,000 to $6,000.  (Heller Affirm. Ex. K.)  In the end, Chin informed her that "FINRA encourages managers to prorate," though Kerman checked on the FINRA intranet and found that it was at the manager's discretion.  (Kerman Dep. 139: 14-24.)

At approximately the same time, Chin also informed Kerman that her new title would be "principal counsel," whereas she had held the title of "trial counsel" at NYSE.  (*Id.* 118: 9-12.) Kerman believed that the change in her title effectively constituted a demotion.  (Kerman Aff. ¶ 72.)  According to Chin, Kerman's title changed because FINRA changed former NYSE employees' grade levels to reflect a new FINRA job categorization system.  (Chin Dep. 122:20-23.)  He claimed that he was not involved in the decision to categorize Kerman as "principal

counsel" and that he believed the decision was made based on the number of years an individual had been out of law school.  (*Id*. 125:4-21.)  The conversion of NYSE job titles to FINRA job titles is described in a chart, which the defendants have provided.  (Walker Decl. Ex. I.)  The chart reflects that the single NYSE title "trial counsel" has been divided into six job titles at FINRA.  (*Id*.)  None of these new job titles is "trial counsel."  (*Id*.)

When she returned from maternity leave, Chin also had a chat with her about her work schedule.  Up until that point, Kerman would usually arrive at work between 8:00 and 8:30, but sometimes as late as 9:00 and usually leave at 5:00 or shortly thereafter.  (Kerman Dep. 158:3-6.)  Soon after Kerman returned from maternity leave, Chin called her into his office to tell her that FINRA required that she work an eight-hour workday and that she could not credit her lunch hour to those eight hours.  (*Id*. 158:11-14.)  He then asked her whether she would prefer to work an eight-to-five shift or a nine-to-six shift.  (*Id*. 158:16-17.)  She indicated that she would prefer to work the eight-to-five shift.  (*Id*. 158:18.)  When Kerman asked her coworkers what shifts they had chosen, they had no idea what she was talking about.  (*Id*. 158:19-22.)  Kerman took this interaction as a sign that Chin was singling her out "to make things difficult" for her.  (*Id*. 158:23-159:2.)  Kerman testified that Chin had helped a paralegal receive overtime credit for working through lunch, though there is no evidence that Kerman ever requested that she be credited with overtime for working through lunch or that any other lawyers were ever given overtime.  (*Id*. 159:2-9.)

Meanwhile, according to defendants, Kerman's performance at work continued to be unsatisfactory.  Chin states that he repeatedly assigned Kerman cases only to find that she did not work on them for months.  For example, Chin assigned Kerman a case in April 2008 and promptly helped created a "to do" list for the case, only to find that she completed no work on

7

the case for five months, despite the fact that Chin and Light repeatedly followed up with Kerman to inquire about the status of the case.  (Chin Decl. ¶¶ 8-16.)  Chin assigned Kerman another case in April 2008 that she did not work on until early August.  (*Id.* ¶¶ 27-33.)  Although she made a small amount of progress on the case in early August, she did not make additional progress on the case until late October.  (*Id.* ¶¶ 33-36.)

During the Fall of 2008, Chin had several encounters with Kerman which she claim reveal his bias against her religion.  In September 2008, Chin asked Kerman whether she had made reservations to attend an upcoming conference.  (Kerman Dep. 187:6-11.)  Kerman informed him that she would not be attending because the conference conflicted with the Jewish holiday Sukkot.  (*Id.* 187:12-20.)  Chin responded, "Pardon my ignorance because my ex-wife was Jewish.  What's Sukkot?"  (*Id.* 187:21-24.)  Kerman believed that Chin's manner was very sarcastic when he asked this question.  (Kerman Aff. ¶ 76.)  She answered his question, and he asked her to write up an email explaining why she would not be attending the conference and what Sukkot was.  (Kerman Dep. 188:6-19.)  Another manager, Suzanne Elovic ("Elovic"), also an observant Jew, did not attend the full conference because of its conflict with Sukkot, though she did attend portions of it.  (*Id.* 188:21-189:3.)

Around the same period, Kerman learned that she was not going to have enough vacation days in reserve to take off time for the Jewish holidays, many of which fell on weekdays that year.  (*Id.* 191:25-192:10.)  As a result, Kerman took several unpaid days off.  (*Id.* 192:11.)  According to Kerman, Chin complained about her failure to plan ahead and told her not to let it happen again.  (*Id.* 192:11-18.)  Kerman testified that Elovic had taken unpaid days off for the Jewish holidays in the past, and "it wasn't a problem."  (*Id.* 193:18-20.)

8

Finally, at an unknown time in 2008, Chin extended Kerman what she felt was a half-hearted invitation to eat dumplings at a restaurant in Chinatown.  (*Id*. 194:8-19.)  Kerman dropped by Chin's office shortly before lunchtime to ask about something work-related, and Chin told her that he and the rest of the unit were going to lunch at Chinatown.  (*Id*. 193:25-194:5.)  He informed her that there would likely not be anything that she could eat, and she declined the invitation.  (*Id*. 194:5-7.)  She felt that Chin was leaving her out on account of her religion because she suspected that he would not have bothered to invite her to the lunch if she had not stopped by his office when she did.  (*Id*. 195:8-18.)

In September 2008, Kerman became active in a group of employees who had complaints about FINRA's maternity leave policy.  (*Id*. 161:3-11.)  The committee was concerned because FINRA employees had received an email stating that FINRA employees would no longer be entitled to take three months of unpaid leave after taking the three months of paid leave that FINRA offered.  (*Id*. 161:3-21.)  Kerman attended several meetings, and Chin was aware that she was a member of the committee.  (*Id*. 161:25-162:3.)  Kerman believes that at least one member of the committee dropped out because she feared work repercussions.  (*Id*. 162:13-17.)  Kerman followed up on the work of the committee by sending an email to Mary Shapiro, the CEO of FINRA, complaining about the policy change.  (*Id*. 167:10-17; Heller Affirm. Ex. M.)  In this email, dated September 19, 2008, Kerman also informed Shapiro, "I would like to get pregnant." (Heller Affirm. Ex. M at 1.)  Kerman sent the email directly to Shapiro and did not copy either Light or Chin.  Chin, Light, and Merrill have stated that they were unaware of plaintiff's email to Shapirio, and plaintiff has offered no evidence to the contrary.  (Defs'' 56.1 Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33.)

9

Shortly thereafter, on October 29, 2008, Kerman learned that she was going to be placed on a Performance Improvement Plan ("PIP").  (Kerman Aff. ¶ 91.)  The PIP was described to Kerman during a meeting with Light and Chin.  Kerman was under the impression that she was being placed on the PIP because she had failed to follow up for a while on the two cases described above.  (Kerman Dep. 277:16-19.)  She also was told that she "needed to just be more efficient and move [her] cases faster . . . ."  (*Id*. 277:14-16.)  Light and Chin also suggested that her deposition-taking skills were lacking.  *Id*. 278:5-8.)  Nonetheless, Kerman now contends that Chin and Light imposed the PIP not because of deficiencies in her work product, but rather as part of a larger effort to "humiliate" her.  (Kerman Aff. ¶ 91.)  In her words, "I knew that the Performance Plan was just another action taken against me in an effort to so humiliate me that I would be forced to quit or, alternatively, to create a paper trail portraying me as a poor performer, which I was not."  (*Id*.)

The PIP criticized Kerman's efficiency, stating, "As of November 1, 2008, you have only completed two of the six investigations that you have been assigned.  Your investigations are quite basic and not the usual caseload for an attorney with eight years of regulatory experience." (Heller Affirm. Ex. P at 1.)  It also criticized Kerman for drafting a memo that relied upon different rules from those in effect at the time of the alleged activity and for conducting a poor deposition.  (*Id*. at 2-3.)  The PIP provided four deadlines that Kerman was to meet over the next sixty days.  (*Id*. at 4.)  Kerman claims that she met all of the deadlines imposed by the PIP. (Kerman Aff. 103.)  There is dispute as to whether she did, however, because she claims that it was sufficient for her to submit first drafts, whereas the Plan itself stated that she was to turn in completed drafts, and Chin claims he never told her otherwise.  (Chin Dep. 214:13-215:18.)

During this period, Kerman continued to have difficulties meeting deadlines.  On November 10, 2008, Chin assigned Kerman a relatively simple case in an effort to demonstrate to her that she was capable of meeting deadlines.  (Chin Decl. ¶ 55.)  According to Chin, the case was the type of case typically assigned to first year attorneys, interns, and paralegals and typically take about a day once the relevant paperwork is received.  (*Id.*)  On November 21, 2008, Kerman informed Chin that he had received the necessary paperwork.  (*Id.* ¶ 57.)  Between November 21, 2008 and March 31, 2009, when Kerman finally turned in a first draft of the memorandum necessary to close the case, Chin inquired about the status of the case eleven times, and she had not made progress on the case.  (*Id.* ¶ 57-64.)

Kerman disputes, however, that her performance was so poor.  Around this time, she began to seek the mentorship of Elovic.  (Kerman Dep. 218:14-219:2.)  On several occasions, she asked Elovic to review her drafts because she wanted "some independent or outside confirmation that they weren't objectively terrible."  (*Id.* 218:24-219:2.)  Of the work Kerman asked her to review, Elovic stated during her deposition, "My impression was that the quality of the written work that I was receiving was adequate or better."  (Elovic Dep. 32:19-21.)  Elovic qualified her answer by stating, "I will say, though, that I have no idea, in terms of the content, whether it accurately summarized all of the findings in the investigation.  In other words, I was literally reviewing it on the four corners that I had in front of me.  I was not reviewing the files.  I was not involved in the investigations."  (*Id.* 33:9-15.)  Kerman also states that on several occasions during the first PIP she asked Chin for feedback, and his feedback was positive.  (Kerman Dep. 237:22-240:7.)

The PIP expired on January 5, 2009.  On January 27, 2009, Chin informed Kerman that he was setting deadlines for her for the upcoming few months.  (Kerman Aff. ¶ 104; Heller

Affirm. Ex. R.)  Kerman objected to a number of these deadlines because they fell on Friday, a day when Kerman typically left early to prepare for the Sabbath.  (*Id*.)  Kerman asked Chin to change the deadlines so that they did not fall on Fridays, and he declined to do so.  (*Id*.)  Shortly after Chin set these deadlines for her, Kerman learned that they were to be incorporated into a second PIP.  Kerman was told that whereas the focus of the first PIP was meeting deadlines, the focus of the second would be on turning in a quality finished product.  (Kerman Dep. 238:7-10.)

On February 25, 2009, Kerman received her evaluation for 2008.  The evaluation criticized Kerman for not making more significant progress on her cases, even though they were relatively basic for an attorney of her experience.  (Heller Affirm. Ex. S at 3.)  It also stated that Kerman's investigations were often "incomplete and inadequate" and provided detailed examples of deficiencies in her work product.  (*Id*. at 4-5.)  On March 3, 2009, Kerman wrote a rebuttal memo to her review.  (Heller Affirm. Ex. U.)  In this memo, she listed several accomplishments from 2008 that she believed Chin had left out of his evaluation, including her ability to cultivate a relationship with a reluctant witness.  (*Id*.)  She also complained about Chin's management style, stating, "Working in this environment is utterly demoralizing.  Mr. Chin is critical of everything I do.  It is very difficult to work in an environment where I am ripped apart.  He beats me down and I know my work does suffer as a result."  (*Id*.)  On March 3, 2009, Kerman submitted another memo to Light in which she complained about Chin.  (Heller Affirm. Ex. V.)  She complained that Chin was unable to be "objective" with her and requested that she be allowed to transfer to a different director.  (*Id*.)  During a March 3, 2009 meeting, Kerman expressed these same concerns to Light and asked that someone other than Chin review her work for the second PIP; Light at this time refused.  (Kerman Dep. 248:22-25.)

Kerman continued to have personality clashes with Chin over her religion.  While Kerman was on the second performance plan, Chin told her to schedule a deposition for March 10, 2009.  (Kerman Dep. 256:15-23.)  She informed him that she would be unable to do so because that day was Purim, which Kerman intended to spend with her family.  (*Id*. 256:24-25)  According to Kerman, Chin rolled his eyes and mumbled, "And what holiday is this?"  (*Id*.)  Kerman felt that he was implying that she was making up the holiday.

Despite the focus on improving quality for the second PIP, Chin states that the product he received from Kerman continued to be substandard.  For example, in one case, Kerman wrote a first draft of a closing memorandum that omitted significant facts.  (Chin Decl. ¶ 43.)  When reviewing the second draft, Chin realized that Kerman had failed to interview several key individuals.  (*Id*. ¶ 47.)  Chin supervised Kerman as she conducted these interviews about a week later.  (*Id*. ¶ 48.)  He states she did not take notes and failed to ask several key questions.  (*Id*.)  About a week and a half after the interview, Chin had to remind Kerman to update FINRA's internal case management system to reflect the fact that she had conducted these interviews.  (*Id*. ¶ 49.)  When Kerman turned in a draft memorandum describing the results of her investigation, she failed to include information learned during the informal interviews.  (*Id*. ¶ 50.)  Kerman disputes that the interviews she conducted with Chin were as important as he describes.  (Pl.'s Rule 56.1 Stmt. ¶ 63.)  She states that she had not interviewed these individuals prior to Chin's prompting because they were not important.  (*Id*. ¶ 63.)  She states that she did not incorporate the information gleaned from the interviews into her next draft because she did not believe that the witnesses provided new information.  (*Id*. ¶¶ 64-65.)

On another case, Chin asked Kerman whether she had confronted a witness with certain documents during a deposition, only to learn that she had not obtained these documents.  (Chin

Decl. ¶ 22.)  Kerman explains that she did not obtain this document because the company initially claimed that it was protected by attorney-client privilege, but waived the privilege at some time after the deposition.  (Pl.'s 56.1 Stmt. ¶ 76.)  When this case was reassigned following Kerman's termination, the new attorney learned that when Kerman requested the firm's policies and procedures, she had neglected to specify that she needed the policies and procedures in place at the time of the disputed transactions.  (Chin Decl. ¶ 25.)  This failure was particularly significant because Chin had previously admonished Kerman that she should always include a date range in such document requests, rather than drafting open-ended requests.  (*Id*.)

Despite Light's earlier refusal to have someone else review Kerman's work, Scott Anderson, an attorney who typically trains new law graduates hired at FINRA, was asked [by Light] to independently evaluate Kerman's work.  (Anderson Decl. ¶¶ 2-3.)  Anderson reviewed the memoranda and case files for three cases.  (*Id*. ¶ 5.)  He stated that one of the three cases met standards, but the analysis contained in two of the cases was lacking.  (*Id*. ¶¶ 8-9.)

On May 1, 2009, after the conclusion of Kerman's second PIP, Light, Chin, and Merrill met to discuss Kerman's future at FINRA.  (Chin Dep. 265:17-266:14.)  Light initially proposed giving Kerman a written warning, but Merrill, who had promoted Kerman in 2005 despite Light's reservations (Heller Ex. I), decided that the time had come to terminate Kerman's employment.  (Chin Dep. 266:14-17.)  Merrill believed that Kerman's performance was so bad that she was a liability to FINRA and that it would be "malpractice" to continue Kerman's employment.  (Light Dep. 190:15-191:2.)  On May 4, 2009, Kerman learned of her termination.  (Kerman Aff. ¶ 139.)

In summer of 2009, Kerman met with Elovic.  At her deposition, Kerman said that Elovic said that Light said following Kerman's termination:  "Oh, don't worry.  She's going to be much

happier now at home with her kids.  Things are going to be great for her."  (Kerman Dep. 51:12-15.)  Elovic was apparently not asked about this at her deposition although she stated that when she learned of Kerman's termination she was "surprised."  (Elovic Dep. 51:3-5.)  FINRA was experiencing a hiring freeze at the time, and it would be impossible to replace her.  (*Id.* 52:10-13.)  In her words,

> My view was that even if the only types of cases that [Chin] and [Light] felt comfortable having [Kerman] handle were relatively simple complex cases, we had more of those to do than we had people to do them, so even under that understanding of her ability to perform it made sense to me to keep her on, rather than get rid of her, because we don't have the ability to replace her at that time.

(*Id.* 52:14-21.)

By Kerman's own admission, FINRA contained a number of female employees with two children, including Light.  (*Id.* 71:19-75:21.)  There were also several young pregnant women. (*Id.* 145:5-10.)  FINRA's enforcement division also employed a number of Jewish employees, including Merril and Light.  (*Id.* 149:5-150:5.)  Nonetheless, Kerman would characterize herself as "observant," and of the Jewish employees in the enforcement division, Kerman would only characterize Elovic similarly.  (*Id.* 150:6-18.)

Following her termination, Kerman filed suit in the state of New York, and the defendants removed to federal court on March 1, 2010.

## STANDARD OF REVIEW

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve

ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party must demonstrate that no genuine issue exists as to any material fact.  *Celotex*, 477 U.S. at 323-25.  As to an issue on which the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325 (rejecting a construction of Rule 56(c) that would require the party moving for summary judgment to produce evidence affirmatively establishing the absence of a genuine issue of material fact with respect to an issue on which the nonmoving party bears the burden of proof).

If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322-23.  In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).  Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.  *See H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (stating that "hearsay testimony that would not be admissible if testified to at the trial may not properly be set forth in [a Rule 56] affidavit") (internal quotation marks and citation omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case," especially "where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than some metaphysical doubt as to the material facts." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotations and citations omitted). Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## DISCUSSION

Kerman's case is unusual in that she brings her suit not under Title VII or the NYHRL, but solely under the NYCHRL. The NYCHRL has mandated a liberal construction of its language, stating,

> The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed.

Admin. Code of the City of New York, § 8-130.

The courts are still working through the impact of this new statute, but several effects are apparent. First, in cases where an employee argues that he or she was subjected to a hostile work environment, plaintiffs need not prove that the atmosphere was "severe or pervasive," a showing they are required to make under Title VII. *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 37-38 (N.Y. App. Div. 1st Dep't 2009). Furthermore, the NYCHRL expands the definition of discrimination beyond "conduct [that] is 'tangible' (like hiring or firing)," a requirement

17

embodied in the federal requirement that an action be "materially adverse" to be actionable, to encompass all allegations that a plaintiff is treated differently based on protected status. *Id*. at 40.  The NYCHRL similarly drops the requirement that retaliation claimants demonstrate that they suffered a materially adverse action. *Id*. at 34.  Instead, plaintiffs need merely show that the complained of conduct was "reasonably likely to deter a person from engaging in protected activity." *Id*. at 34.  Of course, since the passage of the NYCHRL, the Supreme Court has ruled that a materially adverse action is any that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006).  The First Department specifically advised that these two standards are not to be considered the same, though the difference between them is somewhat elusive. *Williams*, 872 N.Y.S.2d at 34 n.14.  Finally, the Second Circuit has directed the district courts to conduct an analysis of the NYCHRL claims that is separate from that undertaken for Title VII and New York State Human Rights Law claims. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278-79 (2d Cir. 2009).

It does not appear, however, that Kerman's case is one whose outcome will turn on the expanded definition of discrimination under the NYCHRL.  It is not in dispute that Kerman was fired and that this action would satisfy Title VII's requirement that the plaintiff suffer an adverse employment action.  What is in dispute is whether FINRA chose to fire Kerman *because* of her poor performance or *because* of impermissible religious or gender discrimination.  In analyzing whether a plaintiff has raised a triable issue of fact as to whether her termination was motivated by discriminatory animus under the NYCHRL, the courts have continued to employ the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Chapman v H & R Block*, 926 N.Y.S.2d 342 (N.Y. App. Div. 1st Dep't 2011); *Kumaga v N.Y.C. Sch.*

*Constr. Auth.*, 910 N.Y.S.2d 405 (N.Y. Sup. Ct. 2010).  "Under this framework, a plaintiff must

first establish a *prima facie* case of discrimination.  In the context of an alleged discriminatory

discharge, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified

for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action

took place under circumstances giving rise to the inference of discrimination.  Once a plaintiff

meets this initial burden, the burden then shifts to the defendant to offer a legitimate

nondiscriminatory reason for the termination.  If defendant does so, the burden returns to the

plaintiff to show that the real reason for plaintiff's termination was his [religion and gender]."

*Ruiz*, 609 F.3d at 491-92.[3]

The Court is mindful of the fact that the drafters of the NYCHRL voiced a preference for

having employment discrimination cases resolved by juries, rather than by judges.  *Williams*, 872

N.Y.S. 2d at 41.  Nonetheless, even under the more liberal NYCHRL, summary judgment will

still be appropriate where a plaintiff does not adduce sufficient evidence of a link between her

termination and a discriminatory motive and where she fails to rebut convincing evidence that

her employer treated her differently for legitimate business reasons, rather than her membership

in a protected group.  *See, e.g.*, *Clark v. Morelli Ratner PC*, 905 N.Y.S.2d 561, 562 (N.Y. App.

Div. 1st Dep't 2010); *Short v. Deutsche Bank Sec., Inc.*, 913 N.Y.S.2d 64, 67 (N.Y. App. Div.

1st Dep't 2010); *see also Melie v. EVCI/TCI College Admin.*, 374 F. App'x 150, 153-54 (2d Cir.

---

[3] Because Kerman has not argued that her case is one of "mixed motive" discrimination, the Court will not consider
her case under this rubric.  Plaintiffs who seek to show that an employer took an employment action for mixed
reasons must make a slightly different showing than when arguing that an employer's proffered reason was
pretextual.  *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992).  In a mixed motives case,
plaintiffs "must initially show more than the 'not onerous' *McDonnell Douglas-Burdine* factors," specifically they
must "prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision."  *Id.* at
1181.  At this point, the burden shifts to the defendant, who may argue "that it would have reached the same
decision as to the employee's employment even in the absence of the impermissible factor."  *Id.*

2010).  Accordingly, while the Court is sensitive to the expansive purposes of the NYCHRL and the necessity of analyzing the statute separately from Title VII, in light of the scarcity of NYCHRL case law, the Court will continue to apply federal Title VII cases regarding proof of discriminatory intent.  It should be noted that the parties, too, rely almost exclusively on Title VII cases in their briefs.

## I.  Discriminatory Termination

FINRA does not dispute that Kerman has satisfied the first and third prong of the *McDonnell Douglas* analysis.  Kerman, as a woman and Orthodox Jew, is clearly a member of a protected class, and her termination is equally clearly an adverse employment action.  FINRA does dispute, however, that Kerman was qualified for her position and that her termination took place under circumstances giving rise to an inference of discrimination.

### A.  *Minimal Qualification*

In order to establish the second element of a *prima facie* case under the *McDonnell Douglas* analysis, Kerman "only needs to demonstrate that she 'possesses the basic skills necessary to the performance of the job.'"  *Owens v. N.Y.C.  Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991).  FINRA disputes that Kerman was qualified for her position, a seemingly difficult argument to make given that she worked as an attorney at NYSE and then for FINRA for approximately eight years before she was terminated.  FINRA counters that as she continued to work and received promotions, more was expected of her, so the question should really be whether she was minimally qualified for the final title she held, that of principal counsel.  It should be noted, however, that Kerman held the position of principal counsel for approximately one year prior to being terminated and the NYSE title of trial counsel, which FINRA appears to argue is equivalent to her subsequent position, for approximately one year before that.

20

As Kerman correctly points out, FINRA is reading too much into the requirement that Kerman be qualified for the position she held.  As the Second Circuit has held, "where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).  In *Slattery*, the Second Circuit rejected a similar attempt to increase the necessary showing for an employee to be qualified, where an employer argued that the plaintiff was not qualified because he had been promoted beyond his level of competence.  *Id*. at 89-90. The court observed, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Id*. at 92.  Here, too, Kerman has made the minimal showing necessary to establish a *prima facie* case, even if her employers were not happy with her performance.  Kerman was an attorney working in an attorney position. *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (concluding that an administrative law judge was qualified for a position based merely on the evidence that he was hired for that position).

### B.  Circumstances Giving Rise to an Inference of Discrimination

FINRA also disputes that Kerman has made a *prima facie* case of circumstances that give rise to an inference of discrimination, essentially arguing that because a number of Kerman's supervisors were also Jewish women who had children, including Light and Merrill, it is inconceivable that Kerman could experience discrimination on the basis of her gender or religion.  Evidence that Kerman's office was populated with working Jewish mothers does weaken Kerman's case that her employers would take special discriminatory notice of her status as a Jewish mother. *Noyer v. Viacom Inc.*, 22 F. Supp. 2d 301, 307 (S.D.N.Y. 1998) (holding that discriminatory animus was not established for a plaintiff who alleged that she was

21

discriminated against for taking maternity leave where numerous other employees, including the plaintiff's interim replacement, were also women who had taken maternity leave).  Nonetheless, FINRA's argument is a bit simplistic.  Even though Kerman shares certain characteristics with her former supervisors, it also seems that she is more religiously observant than they and that she has more children (especially if she were to have a fourth child, as she stated that she wished to do).  "Even if [Kerman and her supervisors are] considered members of the same general class—Jewish individuals—there is no conclusive presumption that a person will not discriminate against members of his or her own class."  *Goldschmidt v. N.Y. State Affordable Housing Corp.*, 380 F. Supp. 2d 303, 317 (S.D.N.Y. 2005) (denying summary judgment where less observant Jews are alleged to have discriminated against an Orthodox Jew); *see also Kramsky v. Chetrit Group, LLC*, 10 Civ. 2638, 2011 WL 2326920, at *7 (S.D.N.Y. June 13, 2011) (denying employer's motion for summary judgment where Jewish man alleges he was terminated after his Orthodox Jewish employers found out that he was not Orthodox).

Nonetheless, Kerman's allegations of religious discrimination are thin.  Kerman's chief complaint is that Chin made remarks about Kerman's celebration of religious holidays that she took to be disrespectful.  Chin asked Kerman to explain the holiday Sukkot, according to Kerman in a sarcastic tone of voice, and asked her, "Another one?" when she wanted to take time off for Purim.  These comments are pretty benign.  *See Ennis v. Sonitrol Mgmt. Corp.*, 02 Civ. 9070, 2006 WL 177173, at *10 (S.D.N.Y. Jan. 25, 2006) (describing a remark that Jews take a lot of religious holidays off to be "of a mild nature"); *cf. Gumbiner v. Williams-Sonoma, Inc.*, 2006 WL 870445 (S.D.N.Y. Mar. 30, 2006) (granting summary judgment to defendants where employer quibbled with plaintiff's desire to take time off for Yom Kippur and then fired her for unrelated performance problems several months later).  Chin also allegedly chastised

Kerman for not planning ahead and needing to take unpaid leave for the Jewish holidays in the fall of 2008.  But there is no evidence that Chin was upset with Kerman for taking time off for the religious holidays, rather than for her apparent inability to anticipate that she would need to set aside vacation days for religious holidays that year.  In the end, Chin allowed Kerman to take time off for the holidays.  These comments seem to fall into the category of "petty slights," *Williams*, 872 N.Y.S.2d at 41, rather than evidence of true discriminatory animus.

Kerman also asked Chin to shift certain deadlines while she was on the second Plan because they fell on Fridays.  As defendants note, Kerman was alerted to these deadlines weeks and months in advance.  Even if Kerman needed to leave a few hours early on Fridays, she could plan around these deadlines.  As Elovic, also an observant Jew, stated during her deposition, "My personal view . . . was that if your deadline is Friday, and you know that you have to leave 2 o'clock on Friday, then your deadline becomes 2 o'clock on Friday.  It's not really a discriminatory practice to refuse to change the deadline."  (Elovic Dep. 76:13-18.)  Kerman seems to believe that the best solution would have been to move the deadlines to Monday, but it would have been equally reasonable to move, say, a forty-five day deadline to a Thursday, a deadline Kerman would have presumably have found less attractive.

Kerman's allegations of gender discrimination fair only slightly better.  Other than the dispute over whether she was a sufficiently competent lawyer, Kerman focuses on three events that she believes give rise to an inference of gender discrimination:  (1) Light's decision to deny her a promotion, which occurred in 2005 shortly after Kerman announced she was going on maternity leave; (2) Chin's alleged negative reaction to Kerman's announcement that she was going on maternity leave with her third child; and (3) Light's alleged comment, allegedly relayed

through Elovic, that Kerman would be better off after she was terminated because she would have more time to spend with her children.

The Court considers the third statement first.  Kerman allegedly went to lunch with Elovic some months after her termination.  During that social visit, Elovic allegedly told Kerman that she had heard Light make the offending remark.  Kerman's statement about what Elovic told her is inadmissible hearsay.  *See Evans v. Port Auth.*, 192 F. Supp. 2d 247, 263 (S.D.N.Y. 2002) (holding that statements of a coworker relating allegedly discriminatory remarks made by a supervisor do not fall within the hearsay exception of Fed. R. Evid. 801(d)(2)(D)).  As such, the Court will not consider it on summary judgment.  As for Light's allegedly discriminatory decision not to recommend Kerman's promotion in 2005, Kerman offers only her own *ipse dixit*.  That she had just announced her second maternity leave (in a department heavily populated with mothers (including Light, also a mother of two)), does not reasonably give rise to an inference that Light's recommendation reflects discriminatory animus.

Kerman's argument that Chin discriminated against her on the basis of her gender also has serious flaws.  Although Kerman claims that Chin's campaign of gender discrimination began *after* she returned from her third maternity leave and stemmed from his perception of her as a mother, it is not in dispute that Kerman received her first negative evaluation from Chin in February 2006, two years before her maternity leave.  The record also reflects that Chin advised Light in 2005 that Kerman's caseload was "junior" and that she needed "to take on more complex matters."  (Heller Affirm. Ex. D., at 3.)  Thus Chin and Light formed and expressed negative views of Kerman long before the period when she alleges that Chin acted with discriminatory intent.  Nonetheless, Kerman has presented evidence, though contested, that Chin made a disapproving comment about her third pregnancy, at least on a personal level.  If an

24

employer makes gender-stereotyped judgments about a female employee's ability to do her job because of her commitments as a mother, that employer is engaged in impermissible gender discrimination. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120-21 (2d Cir. 2004). While a single comment made two years before Kerman's termination is weak evidence of intent, *see* discussion in Section D, *infra*, the Court considers it sufficient to meet plaintiff's minimal burden of establishing a *prima facie* case.

    *C. Legitimate Non-Discriminatory Reason*

        After the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the employee's termination. FINRA argues that it terminated Kerman not because of her gender and religion, but rather because of long-standing performance issues. Kerman received her first negative evaluation in 2006 for the year 2005. She received a passable evaluation for 2006, but another negative evaluation for 2007. These evaluations all reflect similar concerns: that Kerman was not completing her work in a timely fashion, that her work was not thorough, and that her case load was what one would expect of a far more junior attorney.

        In 2008, Kerman let several cases lapse for months at a time. Her supervisors then placed her on a PIP. After the end of the first PIP, Kerman was placed on an extended PIP. During this second PIP, Kerman was to focus on improving the quality of her work product. Chin conducted a thorough review of Kerman's cases and the underlying case files and found that on several occasions, Kerman failed to interview key witnesses, omitted outcome-determinative facts from her closing memoranda, and relied on incorrect legal analysis. Anderson was also asked to conduct an independent evaluation of Kerman's work, and he also found significant defects in her work. FINRA "has produced a detailed record of Plaintiff's performance deficiencies leading

25

up to Plaintiff's discharge and has, therefore, met its burden [of articulating a legitimate, non-discriminatory reason for termination]." *Revere v. Bloomingdale's, Inc.*, 03 Civ. 5043, 2006 WL 3314633, at *8 (E.D.N.Y. Nov. 14, 2006).

   *D.  Pretext*

      In the final stage of the *McDonnell Douglas* framework, after the defendant has put forward a legitimate, non-discriminatory reason for the adverse employment action, the burden again shifts to the plaintiff to demonstrate that the action was pretextual.  "In such situations, plaintiff carries the ultimate burden of persuasion and must produce evidence such that a rational finder of fact could conclude that the adverse action taken against her was more likely than not a product of discriminatory animus."  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 504 (2d Cir. 2009).  The Court is sensitive "to the fact that employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law."  *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008) (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464-46 (2d Cir. 1989).  Summary judgment, however, will be appropriate "if the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 249 (2d Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

      In arguing that FINRA's reasons for terminating her were pretextual, Kerman argues that the allegations in her *prima facie* case also give rise to an inference of pretext.  Kerman argues, *inter alia*, that the fact that Light recommended a delay in her promotion shortly after she announced she was going to take maternity leave to have her second child demonstrates that

Light harbored a discriminatory bias.  Kerman offers no evidence of bias other than temporal closeness.  But temporal closeness gives rise only to a weak inference of discriminatory intent even with respect to a employee's termination.  *See Chow v. Stride Rite Corp.*, 05 Civ. 2417, 2009 WL 196030, at * 5 (S.D.N.Y. Jan. 27, 2009) (holding that the fact that an employee was terminated shortly after requesting maternity leave "can give rise to at most a weak inference of discrimination").  Here, of course, plaintiff was promoted despite Light's recommendation.  Further, Kerman conceded that a number of female employees in her office (including Light) had two children.  It thus seems unlikely that Light would single Kerman out for behavior that was apparently in accord with FINRA practices.

Chin's alleged comment requires more careful consideration.  Asking Kerman whether her pregnancy was planned, if nothing else, shows poor judgment.  Further, by asking her questions such as, "Don't you have your hands full?" Chin could be seen as drawing a line between Kerman's job performance and her status as a mother.  Nonetheless, Kerman's evidence that Chin disapproved of her motherhood consists solely of this one exchange.  Kerman told Chin in March 2007 that she intended to take maternity leave.  She did not take leave until June 2007.  And Chin's allegedly discriminatory behavior did not commence until she returned in February of 2008, almost a full year after Chin's remark. Moreover, Chin had been critical of Kerman's performance as early as 2005, that is, well before he is alleged to have developed his discriminatory animus.

Kerman cites *Back*, 365 F.3d 107, for the proposition that assuming a woman with children will be unable to handle her work constitutes gender discrimination.  But the facts of *Back* were far stronger than those here.  There, the plaintiff, a school psychologist, received consistently good performance evaluations until shortly after she returned from maternity leave.

*Id*. at 114-15.  As she was nearing the time when she was up for tenure, her supervisors began to make statements to her suggesting that she put off having further children, that she would cut back on her hours after she reached tenure to spend more time with her children, and that she could not perform her job with young children.  *Id*. at 115.  The court observed that the plaintiff had received consistently good performance evaluations until the approximate time when the discriminatory remarks began and noted that plaintiffs supervisors repeatedly in their remarks made a connection between plaintiff's gender and her job performance.  *Id*. at 124-25.  Based on these facts, the court concluded that summary judgment was not appropriate.  *Id*. at 125.

Here, the centerpiece of Kerman's case for discriminatory animus is a single remark by Chin.  Although Kerman also attempts to suggest that Chin was discriminating against her by forcing her to work a set 8:00 to 5:00 schedule, perhaps suggesting that she was not willing to put in time at work with young children at home, she herself admitted that she was not consistently working a full day prior to her conversation with Chin.  And both Light and Chin's negative performance evaluations began well before Chin's alleged remarks, countering Kerman's suggestion that Chin's later evaluations were colored by his skepticism of her abilities as a working mother.

Chin's one remark is more similar to the remark in *Feinerman v. T-Mobile*, 08 Civ. 3517, 2010 WL 331692 (S.D.N.Y. Jan. 28, 2010).  There, a working mother was fired despite good performance in many respects because she could not meet the travel demands of her job with young children.  *Id*.  The plaintiff alleged that her supervisor joked with her while they were attending a conference that men enjoyed traveling for work because it gave them an opportunity to get away from their children, so it would be easier for a man to have her job.  *Id*. at *4.  The remark itself did suggest that the plaintiff was less able to do her job because as a woman, she

experienced increased childcare responsibilities.  *Id*. at *11.  And her supervisor, who participated in the decision to terminate the plaintiff, made this remark while the employer was considering terminating her.  *Id*.  Nonetheless, this one remark was not sufficient to defeat summary judgment where the defendant adduced substantial evidence that the plaintiff was not meeting a requirement of her job.  *Id*. at *11-*12.  Here, too, FINRA has put forth substantial evidence that Kerman's job performance was not satisfactory.  A single alleged inappropriate remark by a supervisor is not sufficient to rebut this evidence.

Kerman challenges FINRA's assertion that her performance was poor.  For this proposition, Kerman relies primarily upon the testimony of Elovic, who did not supervise Kerman's work, that her written work product was "adequate or better."  She argues that Chin himself praised her work (or at least refrained from criticizing it) when she asked him for feedback when she was on the first and second PIP.  And she also argues that Anderson's supposed independent review of her work was unduly influenced by Chin and Light's prior assessment of her work.

Elovic offered only qualified praise for Kerman's work.  She emphasized that she had not seen the case files underlying Kerman's memoranda and stated that her exposure was limited. Kerman argues that the fact that Elovic did not see the underlying case files was irrelevant because she did not usually review these.  But Kerman's argument misses the mark.  Because Elovic was able only to read what Kerman had written, she did not have the opportunity to determine whether Kerman's finished work product was accurate.  She was limited to judging Kerman based on her writing style.  Chin and Light's primary criticism of Kerman's work was not that her writing was poor, but rather that she took a long time to complete her work and that her analytical skills were lacking.  It would be almost impossible to determine whether an

attorney had made such errors without reviewing the files underlying a finished memorandum. Elovic's professed surprise that Kerman was fired offers even less support for the proposition that Kerman was a passable employee.  She was surprised that Kerman was fired because FINRA was in the midst of a hiring freeze and would not be able to replace her.  In other words, even if Kerman was only able to do basic work, in Elovic's view, it was better to have someone doing basic work than to have no one at all.  Elovic essentially damns Kerman with faint praise.

Kerman's argument that Chin at times seemed to praise her work fairs little better.  "The mere fact that an employee received positive performance evaluations and subsequently received negative evaluations is insufficient to establish that the latter were pretextual."  *Miller v. Nat'l Ass'n of Secs. Dealers, Inc.*, 703 F. Supp. 2d 230, 246-47 (E.D.N.Y. 2010).  Here, an inference of pretext is further diminished by the fact that her one positive review for 2008 was preceded by Light and Chin's negative comments for 2004 and 2005.  Similarly, the fact that a supervisor earlier failed to criticize an employee's work does not render later criticism pretextual.  And the fact that Chin did not provide Kerman with substantive feedback when she requested it may have been an indication that he was an imperfect supervisor, but it does not establish pretext.

Finally, Kerman offers no proof that Anderson's independent review of her work was biased beyond her own conjecture.  Anderson himself states that Chin and Light did not influence his assessment.  "Such conjecture cannot establish pretext."  *Kolenovic v. ABM Indus., Inc.*, 361 F. App'x 246, 249 (2d Cir. 2010).  Kerman has failed to rebut defendants' legitimate, non-discriminatory grounds for her termination.  As such, defendants' motion for summary judgment with respect to Kerman's termination claim is GRANTED.

## II. Retaliation

In order to make out a *prima facie* case of retaliation under the NYCHRL, a plaintiff

must show by a preponderance of the evidence (1) that she engaged in protected activity known

to the defendant; (2) that her employer took an action that would be reasonably likely to deter a

person from engaging in protected activity; and (3) a causal connection between the protected

activity and the alleged retaliatory conduct.  *See Williams*, 872 N.Y.S. 2d at 34; *Kessler v.

Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006).  Kerman argues that

her employers retaliated against her for participating in the committee urging reforms to

FINRA's maternity leave policy by placing her on  a PIP and eventually firing her.  Neither party

offers any argument as to whether Kerman's participation in the committee was a protected

activity.  Therefore, for the purposes of this opinion, the Court assumes without deciding that it

is.  Because she was placed on the first PIP approximately one month after joining the

committee, Kerman infers that her placement on PIP was because she had participated on the

committee.

The fundamental problem with Kerman's argument is that her placement on the PIP was

but one incident in a long string of negative evaluations that she received at work, both before

and after her participation the committee.  Kerman received her first negative evaluation (from

Light) in 2005, her second in 2006 (from Chin) and a third (also from Chin) in 2008,

approximately seven months before she began to participate in the committee.  In other words,

Kerman has not made out the third element of the prima facie case because she has not

established a causal connection between the allegedly protected activity—participation in the

committee—and the adverse employment actions.  "Where timing is the only basis for a claim of

retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in

any protected activity, an inference of retaliation does not arise." *Slattery*, 248 F.3d at 95.[4]

FINRA's motion for summary judgment with respect to Kerman's retaliation claims is

GRANTED.

## CONCLUSION

For the foregoing reasons, FINRA's motion for summary judgment [14] is GRANTED in

its entirety.   The clerk of court is requested to close this case.

**SO ORDERED.**

Dated:  New York, New York

September **30**, 2011

Richard J. Holwell

United States District Judge

---

[4] In places, Kerman seems to argue that her termination was retaliation for complaining about Chin's discriminatory treatment of her in her March 3, 2009 memo to Light.  The incident that gave rise to this alleged instance of retaliation occurred several months after Kerman was placed on the first PIP, and so Kerman has failed to make a *prima facie* case of retaliation for this claim for the same reasons.